**STATE of Missouri, Respondent,**

v.

**Marcus GOODWIN, Appellant.**

No. 48154.

Supreme Court of Missouri,

En Banc.

Jan. 8, 1962.

Lee Virtis Swinton, Leonard Hughes, Jr., Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., George W. Draper, II, Asst. Atty. Gen., Ben Ely, Jr., Asst. Atty. Gen., for respondent.

LEEDY, Judge.

Marcus Goodwin was convicted of murder in the first degree in having killed Mazie Lee, and he appeals from the judgment sentencing him to the extreme penalty as fixed by the verdict.

The trial was exceedingly brief, having begun and ended on the same day. That portion of the transcript embodying the evidence consists of about thirty-five pages, thus indicating the likelihood that not more than one hour was consumed in hearing the evidence. Such extreme brevity would naturally affect the error potential of the trial, and perhaps account, at least in part, for the want of more numerous assignments than the four appearing in his motion for new trial, as follows:

"1. Because the verdict is the result of bias and prejudice on the part of the jury.

"2. Because the State made improper arguments to the jury concerning a revolver when there was no evidence adduced from the witness concerning whether the revolver was loaded or unloaded.

"3. Because the State failed to introduce enough evidence of the corpus delicti that was independent on the extra judicial confession of the defendant.

"4. Because the attorney for the defendant was unable to get any cooperation from the defendant in preparing his defense, therefore, his trial was not one which accorded him of his constitutional rights."

The evidence on the part of the state consisted of the testimony of three members of the Police Department of Kansas City, a deputy coroner of Jackson County, photographs of the premises in question, and the defendant's written confession, an outline of which follows:

The defendant (age 36) and Mazie, although not married, had been living together as man and wife since 1954, meanwhile becoming the parents of three children. A few weeks prior to the date of the homicide (May 30, 1959) they had "split up," and Mazie and the three children moved to 1612 East 26th to live. Shortly after 5 a. m., on the day in question a patrolman, Kenneth Simpson, "had occasion to investigate a call for information" at 1612 East 26th Street. On arrival there he found the glass in the front door had been broken. He entered, and passing through several rooms, went to the rear of the house and found Mazie (clad in nightgown and panties) lying on the kitchen floor. She had been shot and stabbed but she was conscious. There was blood around her. This witness saw two wounds, but did not know whether there were more. There was blood on the floor

and on the refrigerator, and also in the kitchen sink or drainboard. A revolver and a butcher knife (with blood on it) were lying on the drain of the sink. Defendant was nowhere about the premises. An ambulance was called and Mazie was sent to General Hospital where at 9:15 o'clock that morning she was pronounced dead.

At 8:40 the same morning, William Frank Linhart, a police officer assigned to the homicide bureau, was dispatched to 3025 Montgall, a converted dwelling that had been divided into several apartments, and which were occupied, one of them by defendant. On arrival the witness found that an explosion (admittedly caused by defendant) had severely damaged the structure, the south wall in that portion occupied by defendant having been completely blown out, and the premises littered with debris. He found a pool of blood next to the gas heater and also found blood on the sink and in the kitchen leading to where the gas heater was situated, indicating "it was going from the stove to the sink * * * or from the sink to the stove, either way." The witness then proceeded to General Hospital (to which place defendant had been removed shortly before the arrival of the witness at the scene of the explosion) where he observed defendant undergoing treatment, but because the patient was then suffering from what was diagnosed as first and second degree burns which covered about 20% of his body, only limited questioning of him by the witness was permitted. The witness testified that during the course of such questioning the defendant admitted he shot and stabbed Mazie, and thereafter attempted to take his life, first by cutting his wrists, and that being too slow, then by placing "himself on the floor next to the gas outlet, disconnecting the heater and placing it in his mouth and covering himself with a blanket and pillow," and finally by lighting a match, causing the explosion; that defendant also stated that had the police arrived prior to the explosion he would have done some provocative act "or attempted something in order for a policeman to

shoot him"—in other words, he wanted the police to take his life, and would have done something to make them shoot him. The witness did not know whether defendant was under sedation at the time he interrogated him at General Hospital, and did not recall whether he was bleeding.

At the time of the explosion there were other people in the apartment house—and, in particular, a man, woman and two children were in the unit adjoining defendant's in which the explosion occurred.

Various photographs of the scene of the explosion at 3025 Montgall and of the premises, interior and exterior, at 1612 East 26th Street were offered and received in evidence without objection. Those of the deceased's dead body were identified, but excluded, and not received in evidence, nor exhibited to the jury.

The third police officer witness in the case, Detective Arthur Jenkins, identified a written statement dated June 25, 1959, and signed by defendant. When offered in evidence as "State's Exhibit 15," defendant's counsel, after having interrogated the witness concerning the circumstances under which it was made (disclosing its voluntary nature), stated expressly that there was no objection to its admission in evidence, and it was accordingly received, and read to the jury. Omitting caption, signature, jurat, and such matters as his name, place of birth, residence, employer, and the fact that he had been advised of his constitutional rights, and other portions not relevant to the one matter (hereinafter discussed) which prompts our making such an extended outline of the facts, the statement proceeds in this way:

"Q Have you been having trouble with Mazie Lee since you have been separated?

"A Yes, one night about six weeks ago I got drunk at the Cavalier Hotel where I have been employed. I talked to Mazie Lee over the telephone and I wanted to go by and see the children and she told me no—I couldn't see

them. First she told me to come on over, and when I got over to her house on 26th St. she wouldn't let me in, and I jumped through the living room window and went in anyway.

"Q Were you arrested at this time? A Yes.

"Q Were you taken to Police Court?

"A No—she told the policeman I was drunk and she wanted them to take me out of there. They took me to jail and held me over night and released me the next day.

"Q When did Mazie Lee have you arrested again?

"A I believe it was on Wednesday night, May 27th, she came down and got a warrant for me for disturbing the peace.

"Q. Were you then taken to Police Court?

"A Yes—I went to court on Friday morning, May 29th, where I was fined $25.00 for disturbing the peace. I couldn't pay the $25.00 fine, and I appealed the case to Circuit Court.

"Q Were you out on bond in this disturbing the peace case?

"A Yes.

"Q When is the next time you saw Mazie Lee?

"A I don't remember what time it was but it was sometime early Saturday morning, May 30th.

"Q Where was it you saw her that morning?

"A At her home I guess.

"Q. Do you recall what happened?

"A I don't remember what happened but things came back to me when I was going to General Hospital in an ambulance after the explosion.

"Q What explosion was this?

"A The house at 3025 Montgall where I live.

"Q Now, what do you recall happened, while you were going to the hospital?

"A While I was laying down in the ambulance, the first thing I thought about was myself. I remember cutting my two wrists and laid down on the floor at 3025 Montgall, and pulled the hose off the gas heater and turned the gas on and swallowed gas about three or four hours. I hadn't died then so I took a match and lit it and tried to blow myself up.

"Q Did an explosion occur at 3025 Montgall as the result of your lighting the match?

"A Yes—it blowed the whole wall out and blowed me out with it.

"Q When did you recall or remember being at Mazie Lee's home at 1612 E. 26th St.?

"A After I got to the hospital.

"Q Do you recall what happened?

"A Not exactly word for word, the the first thing that came to me was that I had shot my wife, Mazie Lee.

"Q Do you recall what happened?

"A Like I told you—I don't remember what time I left my house and went to her place. I don't recall how I got there. It all seemed like a dream to me while I was at the hospital.

"Q Do you remember being at 1612 E. 26th St.?

"A It all came to me after the explosion, that I had shot Mazie Lee.

"Q How did you get in the house at 1612 E. 26th St.?

"A I broke the glass out of the front door or front window, and entered.

"Q Where was Mazie Lee then?

"A She was in the kitchen.

"Q Did you have the gun with you when you broke in the door?

"A Yes.

"Q What happened after you went in the kitchen where Mazie was?

"A I must have shot her.

"Q Did you also stab her? A Yes."

Detective James also produced the revolver and butcher knife which defendant (in the foregoing statement) had identified as the weapons with which he shot and stabbed Mazie. Both were offered and received in evidence.

The deputy coroner described five separate bullet wounds found on various parts of Mazie's body (one in the right lumbar region and one in the left lumbar region, "both on a line parallel with the transpyloric plane of the body"; one posteriorly opposite the first lumbar vertebra; one in the left scapular region which did not reach into the chest cavity; and one on the outer side of the left gluteal region in the fleshy part of the buttocks), and one stab wound which entered the right pleural cavity, fracturing the twelfth rib. He gave as the cause of death "shock and internal hemorrhage resulting from gunshot wounds in the abdomen."

The theory of insanity as a defense was attempted to be injected into the case in defendant's opening statement to the jury (made immediately following that of the prosecutor), and in which it was also indicated that the evidence to be relied on would be that put on by the State. Said opening statement is, in its entirety, as follows:

"MR. SWINTON: I represent the defendant here in this matter. Our evidence in this case will be primarily what the State will put on, the State's evidence. Now, I am making this statement to you because I want you

to listen to the State's evidence thoroughly, because the evidence will show that the defendant also made an attempt to take his own life. He made several attempts to take his own life. By doing so, we feel that this man was insane, and that will be his defense. Therefore, I am requesting again that you listen to the State's evidence very thoroughly. Thank you."

As thus forecast earlier in the trial, when the State's evidence was closed, defendant put on the stand as his own witness Officer Linhart, who merely reiterated his testimony given on behalf of the State with respect to what defendant had told him concerning his several attempts to commit suicide. The only other witness called on defendant's behalf was defendant himself. He disclaimed any knowledge or recollection of the homicide, or of his attempted suicide, or of having made the oral statements attributed to him by Officer Linhart, nor of the written statement of June 25. His memory was practically blank except that he did admit he had served an indeterminate term (5 years to life) in San Quentin prison.

█ Because of the severity of the punishment and the general tenor of the proceedings and trial, and notwithstanding the fact that the motion for new trial does not challenge the sufficiency of the evidence to support the verdict, we have concluded that the court should sua sponte exercise the discretionary power vested in it under Rule 27.20(c), V.A.M.R., by examining into the only question that could conceivably arise on the evidence (and then only upon cursory or superficial examination of it), and that is whether the proof was sufficient to submit the element of deliberation, and hence the hypothesis of murder in the first degree.

█ The element of deliberation marks the fundamental distinction between murder in the first degree and murder in the second degree, being an essential element of the former, and when lacking the crime is murder in the second degree. State v. Liolios, 285 Mo. 1, 225 S.W. 941; State v. Eaton, (Mo.) 154 S.W.2d 767, 768–769. "The general rule is that a presumption of murder in the second degree arises from an intentional killing of a human being by another where a deadly weapon is used by him at a vital part of the body, absent proof of other facts tending to show deliberation to raise such killing to first degree murder, or to show want of premeditation and malice to reduce the killing to manslaughter, or to show that such killing was excusable or justifiable." State v. Snow, 293 Mo. 143, 149, 238 S.W. 1069, 1071. See, also, State v. Kyles, 247 Mo. 640, 647, 153 S.W. 1047, 1050; State v. Harris, (Mo.) 177 S.W. 362, 364; State v. Eason, 322 Mo. 1239, 1250, 18 S.W.2d 71, 76; State v. McCracken, 341 Mo. 697, 701, 108 S.W.2d 372, 374. But it is equally well established that the deliberation and premeditation necessary to constitute murder in the first degree may be inferred from the circumstances of the homicide. State v. Johnson, (banc) 362 Mo. 833, 838, 245 S.W.2d 43, 46; State v. Kenyon, 343 Mo. 1168, 1177, 126 S.W.2d 245, 250; State v. Cade, 326 Mo. 1132, 1137, 34 S.W.2d 82, 83.

Because the case was not submitted on any such theory, we do not pause to consider the interesting possibility of whether (if defendant's forcible entry into Mazie's dwelling was with the intent to commit a felony therein—so as to constitute the offense of burglary in the first degree, section 560.040, RSMo and V.A.M.S.), the case would be within our felony-murder statute, section 559.010, RSMo and V.A.M.S., which provides, in pertinent part, that "[E]very homicide which shall be committed in the perpetration or attempt to perpetrate any * * * burglary * * * shall be deemed murder in the first degree." In passing, it may be added that we have found no case of homicide arising out of a burglary where the burglarious entry was with the intent to commit that particular homicide.

■ We are of the opinion that the following circumstances are sufficient to take the case out of, and make inapplicable the rule mentioned above under which a presumption of second degree murder attaches: First, and of prime significance, is the proof that at a very early morning hour (five o'clock) defendant forcibly broke into and entered deceased's dwelling armed at the time with the revolver with which the homicide was admittedly committed; the recent hostility between the parties, incidents of which included their separation, and deceased having twice caused defendant to be arrested and detained in jail—the last time a day or so prior to the homicide; and the manner of accomplishing the killing, that is, by the infliction of five bullet wounds and one stab wound. These facts and circumstances are sufficient to support, or from which to draw the inference that the killing was deliberate and premeditated. The forcible entry bespeaks preparation, going to deliberation. Indeed, the unlawful breaking in aspect of the case approximates or is comparable to that deliberation evinced by lying in wait, then assaulting and killing the victim. Under this view, which is warranted by the record, the act was not impulsive or sudden, but one of a deliberate and premeditated nature, and hence the evidence supports the verdict and judgment.

■ Defendant has filed no brief, so we look to the motion for a new trial for his assignments of error (as hereinabove quoted). The first of such grounds ("Because the verdict is the result of bias and prejudice on the part of the jury") is, obviously, and under repeated holdings, too general to preserve anything for review. Rule 27.20(a); State v. Mayabb, (Mo.) 316 S.W.2d 609, 610; State v. Hagerman, 361 Mo. 994, 238 S.W.2d 327, 329; State v. McMillian, (Mo.) 338 S.W.2d 838, 845.

■ The second ground likewise lacks the specificity required under Rule 27.20 (a), but in any event no objection was made at the trial to any argument to which the assignment could possibly apply, and this, too, would be fatal, unless the argument was so glaringly offensive and prejudicial that the court should have intervened and stopped it without objection on defendant's part, but we find nothing in the record to indicate argument of that character was made by the prosecutor.

■ The third assignment is also so indefinite and lacking in particularity as to warrant our ignoring it; but again, for the same reasons that prompted us to examine into the sufficiency of the proof of deliberation, as well as to delve into the matter last above discussed, we shall undertake to interpret the meaning of this assignment, and ascertain the nature of the complaint. If it means that the court erred in admitting the confession for the reason that independently of it the corpus delicti was not sufficiently proved (that is, to justify its admission), it is to be remembered that, when offered, defendant's counsel stated that there was no objection to its introduction, and it was accordingly received, and, this being so, the defendant may not now claim error in that ruling. On the other hand, if the assignment means either that the corpus delicti must be proved wholly independently of the confession, or that the evidence was insufficient whereon to submit the case to the jury because there was no sufficient corroboration of the confession to warrant a conviction, such contentions are untenable.

■ As was said in State v. McQuinn, 361 Mo. 631, 235 S.W.2d 396, 397: "In murder, the corpus delicti consists of two elements: (1) The death of the person alleged to have been murdered, and (2) the criminal agency of someone other than deceased causing the death. State v. Lyle, 353 Mo. 386, 390, 182 S.W.2d 530, 532; State v. Payne, 331 Mo. 996, 1003, 56 S.W. 2d 116, 118; State v. Meidle, Mo.Sup., 202 S.W.2d 79, 80. It is undoubtedly the rule that confessions of a crime not made in open court or before a committing magistrate and without proof aliunde that a

crime has been committed will not sustain a conviction. However, it is equally well established that full proof of the corpus delicti independent of the defendant's extrajudicial confessions is not required. State v. Kauffman, 329 Mo. 813, 46 S.W.2d 843; State v. Skibiski, 245 Mo. 459, 150 S. W. 1038; State v. McGuire, 327 Mo. 1176, 39 S.W.2d 523. As said in State v. Thompson, 333 Mo. 1069, 1080, 64 S.W.2d 277, 282, 'On the contrary, what seemed to be only slight corroborating facts have been held sufficient. State v. McGuire, 327 Mo. 1176, 39 S.W.2d 523.'

"The Skibiski case, supra (which is a leading case), after declaring that full proof of the corpus delicti independent of the confession is not required, continues thus, 150 S.W. loc. cit. 1039: 'If there is evidence of corroborating circumstances which tend to prove the corpus delicti and correspond with circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the corpus delicti is sufficiently proved in a given case. (Citing cases.)' And in State v. Morro, 313 Mo. 98, 108, 281 S.W. 720, 722, the rule was put this way: 'If there is evidence of corroborating circumstances which tends to prove the crime and corresponds with circumstances related in his confession, both the circumstances and the confession may be considered in determining whether the corpus delicti is sufficiently proved. If a confession is made which enables the state to discover corroborating evidence of the particular crime confessed, the corroborating evidence need not be sufficient, independent of the confession, to establish complete proof that the crime is committed. (Citing cases.)'" See, also, State v. Falbo, (Mo.) 333 S.W.2d 279.

■ Grounds of a motion for new trial do not prove themselves, and the fourth assignment of defendant's motion is no exception to this rule. We have then only the bare assertion of defendant's failure to cooperate with his counsel in the preparation of the case for trial, and, of course, this presents nothing for review.

■ We have examined those portions of the record required by Rule 28.02 to be reviewed whether error be assigned or not, and find no reversible error therein. Because of inept and careless draftsmanship, the form of the information is not to be regarded as a model or commended, although it is in substantially the same form as that in State v. Haynes, (Mo.) 329 S.W. 2d 640, which, after verdict, and in the absence of attack before trial, was held sufficient. The only difference in the Haynes information and the one at bar is that here the language of the charging portion is that defendant did "make an assault in and upon Mazie Lee with a deadly and dangerous weapon, to-wit, a gun and knife, a gun loaded with gunpowder and leaden balls, then and there inflicting" the mortal wound, etc. In other respects the information is subject to the same objections as were leveled at the Haynes information. We conclude, for the reasons stated in the Haynes case, that after verdict, and in the absence of a motion or request for a bill of particulars under Rule 24.03, the instant information is sufficient.

It is difficult to see how it could be thought there was any probative evidence of insanity, but the court, nevertheless, (no doubt out of an abundance of caution) instructed on insanity as a defense. And it would seem that it was out of a desire to protect every possible right of the defendant that the court gave an instruction on *manslaughter*, and (notwithstanding defendant's confession) one on circumstantial evidence. It will be seen, therefore, that defendant has received more than his due as regards the fairness of his trial below, as he has here in the matter of appellate review of his conviction. The judgment is affirmed, and under Rule 28.14 it is directed that the sentence pronounced be executed.

All concur.

Date of execution set for Friday, February 23, 1962.